Case No. 20-3654, United States of America v. Lisa Elias, Argument Not to Exceed 15 Minutes Per Side, Mr. Matthew Ahn. Good morning, and may I please... I'm sorry to interrupt you. Can you please just tell me how much time you want to reserve, and then you may proceed. Yes, I'd like to reserve three minutes for rebuttal, please. Okay, you may proceed. Thank you. Thank you. Good morning, and may it please the Court. My name is Matthew Ahn, and I represent Lisa Elias, the appellant in this case. Ms. Elias filed a pro se motion for compassionate release on April 30th, and through counsel, a supplemental motion for compassionate release on April 6th. At that point, the District Court decided it had already seen enough. Without even waiting for the government to respond to the motion, the District Court denied Ms. Elias' motions on the next business day, stating that her circumstances were not extraordinary and compelling. The District Court, in its one paragraph of analysis, committed two errors. First, it ignored the medical sources provided in Ms. Elias' motion to say that no evidence existed that hypertension was tied to COVID-19 outcomes. Second, it relied solely on case counts to establish that no severe outbreak was occurring at FPC Alderson, despite discussion in Ms. Elias' motion that the BOP's testing efforts at Alderson and at other BOP facilities had been woefully inadequate. Ms. Elias therefore asks this Court to remand this case to the District Court so that these errors can be corrected. I'd like to begin with the medical sources. Ms. Elias' supplemental motion talked at great length about the blood clotting related effects of COVID-19. It cited two primary source studies, two news articles from late April 2020, that collected several additional primary source studies. The conclusion of each of these studies is that your client has hypertension, right? And so you're trying to use these medical sources to link hypertension to an increased risk of contracting COVID-19. Do you want the District Court to establish that your client actually has hypertension? Isn't that missing from the record here? So, you're correct, yes. There was not documentation submitted at the time of this. If this Court feels that the… Was it ever submitted? No, but again, the Court's denial came, again, one business day after the submission of the initial motion. The pro se was submitted eight days before, but then they submitted it on the 6th, right? And so there were two opportunities, in theory, to submit it. And all that was left was the government's response, come and submit it. Your Honor, yes, there were two opportunities for that. But the District Court, you know, if the government were to respond as they did in the briefing in front of this Court, that documentation had not… We could have sought to provide those documents either in a reply or in a sort of supplemental filing as well, if that was going to be relevant to the Court's consideration of this motion. The District Court did not rely on the fact that there was no documentary evidence. They relied solely on the fact that, by their estimation, there was no evidence. I'd also just like to clarify, Ms. Elias's theory of extraordinary and compelling circumstances was not premised solely on hypertension. It was premised on hypertension in combination with the effects of several injuries that she had sustained while at FPC Alderson, which had led her to some other chronic conditions and had not been treated well, and that the combination of those symptoms and her sedentary lifestyle, as well as hypertension, would create extraordinary and compelling circumstances in this case. The District Court did not even reach that question in its analysis. Mr. Rahn? Oh, go ahead. Mr. Rahn, in your initial brief, you didn't bring up that the District Court, whether it used the correct standard or the wrong standard, for lack of a better way of describing it. The government then brings it up in its response, and you hit it in the reply. I'm just curious, how do you think we should interpret the statute and the guideline that goes with it, 1B1.13? Sure. So the only circuit court to rule directly on this issue so far is the Second Circuit, which they did in the U.S. v. Brooker case, which we noticed this court in the 28J letter. I believe that the Second Circuit's arguments there are compelling. Can I ask you a related question? Because the way I read the statute, I know no one's done it yet this way, but it seems to me it's an exhaustion statute. It says that the defendant can bring a motion after he or she, in this case, has exhausted through the BOP. Why wouldn't we interpret this law as we do traditional – in all sorts of cases, we have agencies where people exhaust. And so the guidelines would be applicable or the note to guide us in what is the proper standard, and then we'd interpret extraordinary and compelling reasons as textualists do. So why isn't that the proper way to think about this as an exhaustion law? That you have to exhaust, and we could see if there's substantial evidence supporting a claim. If the BOP denies a claim, they could bring it in the court, and we'd look and see if there's substantial evidence. I'm not 100% sure that I understand your position. Is it that the district court would use a substantial evidence standard of review? So let me give you an example, maybe a hypothetical help. So you have a defendant who suffers – who's 30 days from dying. They have stage 4 cancer, and the BOP denies it, the motion. Okay, it seems pretty extraordinary and compelling. You would then – because it says in the law itself you have to fully exhaust. You would then bring your claim in district court and say substantial evidence supported. I met factor number one, whatever it is, the health factor, and there's substantial evidence supporting it. And the district court would rule presumably in your favor in that instance because you would have substantial evidence. You'd have medical evidence supporting it. So, okay, and I just want to clarify again. The standard would be that the movement would have to provide substantial evidence to the district court? Yeah, I mean, I'm not saying substantial evidence is the right standard. I'm saying that that's what we often do when we have exhaustion in administrative agencies. As you go to an administrative agency, you try to exhaust. You can always bring a motion or an appeal in many instances in our court, and you have to demonstrate substantial evidence. It kind of brings all the pieces – I'm not saying it's even the right interpretation. I'm struggling with it, to be candid with you, but it says extraordinary and compelling reasons. It seems to me the court should interpret what that means. It says – and that it's consistent with the policy statements. It seems to me the policy statements don't necessarily apply to the court, but they do apply to the BOP at the very least. And then it gives three reasons that potentially would apply to the court. And so if you meet one of those reasons and the BOP denies it, you bring a motion in our court, and we see if it meets it. Why isn't that the right way? I'm just – I'm thinking out loud, to be honest. Sure, and I think I understand better at this point. I think that the Second Circuit's position here sort of addresses that to some extent. It notes that to the extent that those are the applicable standards, they are applicable only to the Bureau of Prisons by the text of the policy statement itself. Why wouldn't they be applicable to the ultimate court's review as well? Because we are reviewing in some sense what the BOP did. The district court is. If you have to exhaust, don't you have to – I mean, isn't the whole principle, there's this word that everyone's ignoring, has fully exhausted all administrative rights. In most cases where we talk about exhaustion, it means you brought the same claim in front of the BOP. Yes, so I think that I understand the merits of the framework that Your Honor is proposing. I think that if that were to be the standard, it would need – I just don't think that the conclusion – Let me do a hypo in your clients, and then I'll be quiet because I'm sure the other judges have questions. Your client has – let's assume that she has hypertension. She would have to submit that documentation to the BOP. The BOP would then say, no, that doesn't meet our threshold. Then a district court would review it. She would submit it and say, look, I submitted substantial evidence to meet the extraordinary and compelling reason standard. This is extraordinary and compelling when combined with COVID, and the BOP should have let me out. The district court would look at it and then review that versus just starting from scratch, which is what it seems to me the Second Circuit allows. Yes, and I guess that the concern that we would have with that framework based on the authority that we have is that I believe that that framework would still flow from the application note to the policy statement. The extraordinary and compelling reason scenarios in that application note, I think, have no power to bind reviewing courts, either for the reasons that the Second Circuit has stated or for the reasoning that we advanced in our reply. Well, Mr. Ahn, in answering Judge Thapar's question, if the condition fits an application note A, B, or C, it seems like that's pretty easy, and it would happen exactly the way Judge Thapar is speculating. But the problem isn't the problem here, it's D, and who gets to determine what are the other reasons in D? And if the Bureau of Prisons doesn't have something that tells us what D is, then I guess, in essence, you are starting from scratch, aren't you? Yes, I think that's a correct characterization. But that, again, that is the operative portion here, I think, is that application note 1D is just that, it's an application note. And so whether the argument is that 1D should include district courts or that application note 1 is simply inapplicable to district courts, I think that the same arguments would still apply. I see that my time is up. I'm happy to answer any further questions. Otherwise, I will reserve my arguments for rebuttal. Thank you, Mr. Ahn. Ms. Healy. Good morning. May it please the Court. Vanessa Healy on behalf of the United States. The district court here properly exercised its discretion to deny compassionate release because Ms. Elias's medical conditions were not sufficiently serious as to constitute extraordinary and compelling reasons required by both the statute, 18 U.S.C. 3582 C1A, and the policy statement, Sentencing Guidelines 1B.1.13. I'd like to begin by briefly addressing some of the questions that the Court raised in relation to Brooker out of the Second Circuit. As an initial matter, the government's position is that the Second Circuit there came to the incorrect conclusion, and we believe that 1B.1.13 still is fully applicable despite any outdated language. I want to ask Judge McKee's question. How do you apply Section D? Because that seems to have multiple problems with how a district court would apply that. So our position is that the entire policy statement is still applicable because the First Step Act did not change any of the substantive standards for compassionate release. It merely changed the process by which compassionate release is brought to the Court. So it used to be, as the Court is well aware, BOP was the only one. Let me give you an example. I'm an inmate, and I challenge under other reasons. The BOP says, no, you don't meet whatever we decide is other reasons. I think that's the language, whatever it is. And then you go to a district court. What does a district court do in that situation? The district court still has the ability to analyze the claims under A through C. They are bound by what the Bureau of Prisons indicates as other reasons. And I think the distinction here is that... It seems to me Congress delegated this to the Commission, not to the BOP. So you've got a double delegation problem. Can you really have the Sentencing Commission then delegate that authority to someone else? Yes, the Sentencing Commission here delegated that authority to BOP before the First Step Act was in place because of their unique position in supervising all of these criminal defendants and their understanding of the compassionate release process. But counsel, I think what you're saying is that's what the Sentencing Commission did. Maybe they did, but where do they get the authority to do that? I thought it was a basic principle of administrative law that when Congress delegates to an agency, the agency can re-delegate within the agency itself. But the Bureau of Prisons is not within the Sentencing Commission. So how is it even valid for the Sentencing Commission to delegate this authority to the Bureau of Prisons in the first place? The Sentencing Commission was tasked with defining extraordinary and compelling and providing examples and specific criteria, which they do in the application note, which is written in a procedurally neutral way for the beginning sections A through C. That has nothing to do with whether the defendant files or BOP files and doesn't give additional authority to define medical reasons, family circumstances, etc. Based on the way that the statute was previously written, where only a motion from BOP could be brought for compassionate release, the other reasons category went to BOP based on their position as the one bringing the motion. I'm still not following. So I bring something for other reasons to the BOP. Go back to my exhaustion example. The other reasons are denied. Assuming the BOP can even do this, which I agree with Judge Larson has some independent problems, but it's denied. You now go to district court. You're saying you've exhausted according to the statute. You're saying the district court can't release someone in the other reasons category because it says one, two, three, and other reasons. Why wouldn't that be exhausted such that you could bring it in the district court? Based on the language of the statute itself and the language of the policy statement, the district court can consider the evidence in front of it and can make a decision to reduce the sentence based on a showing of extraordinary and compelling. What the statute does not allow the district court to do is to actually come up with its own extraordinary and compelling reasons to, on an individual basis, define what that sentence means. Correct. Based on the language of the policy statement. So the government's position would be that the full policy statement is still applicable. And when you look at application note one, even if you want to pull that out separately, that is filer neutral, and it has nothing to do with whether or not the defendant is bringing a claim or BOP. So that one, even if you need to put aside the language upon a motion from BOP, would still be applicable here. And, for example, the Sentencing Commission, when tasked with defining this criteria, they could have written that application note as a standalone policy statement, 1B1.14. So it still has the full wave effect because it's defining the criteria as they were tasked to do through the statute. And even if we take 1B1.13 completely out of the picture here in this specific case, the district court in no way abused its discretion by determining that Ms. Elias' hypertension did not constitute extraordinary and compelling. And as Mr. Ahn noted, they're arguing that the district court ignored the medical sources and relied solely on case counts. And that's just not the case here. In terms of Ms. Elias' medical condition, as an initial matter, she did not submit any medical records to support the claim that she had hypertension or suffered from sedentary activities based on her previous falls. And there are numerous district court cases dealing with compassionate release that highlight the burden of the defendant, including the burden to provide medical records. So the district court, even though it did not rely on that, it could have denied on that basis alone. Next, the hypertension, the court properly concluded that this was insufficient grounds for compassionate release because it's not a terminal illness as defined in application note A. And the presence of COVID-19 doesn't change that analysis at all. The CDC has issued specific guidance related to what creates a higher risk for suffering from COVID-19. And at the time of the court's order, which was back in June, hypertension was not on that list. Therefore, by having hypertension, she's not at a higher risk of contracting, and there was no evidence that she wasn't able to provide self-care in prison. Now, the CDC did revise those lists later in June, and they put hypertension on the second list of this is something that might cause a higher risk. But again, many courts have decided that hypertension on its own, because it's not a terminal illness, and it doesn't affect the ability to provide self-care, doesn't reach the level of extraordinary and compelling. The CDC itself estimates that hypertension affects nearly 44% of the United States population. It is a common condition that can't constitute extraordinary and compelling in these circumstances. So I understand all that. And I think what you're trying to say to us is the district court here assumed the legal authority that the appellant wants the district court to have, that is to define extraordinary and compelling for itself, and still rejected the claim. But I want to ask you a question just about your prior theory, which is that D binds both the Bureau of Prisons, right? The Bureau of Prisons gets to define what's extraordinary and compelling, and then those criteria also bind the district court. So the statute in 28 U.S.C. 994 D says the commission in promulgating general policy statements shall describe what should be considered extraordinary and compelling. And here they did it in an application note. Is there any distinction that should be relevant to us between an application note and a general policy statement? I'm not quite sure what the relationship is between those two things and whether it affects the validity of your theory. Yes, Your Honor. And many times there is a significant distinction between the policy statement itself and the application note, because often the application note is not submitted to Congress in the same way that the actual policy statement is itself. However, here there are a couple different distinctions. The Sentencing Commission wrote the policy statement and the application note together. They use the application note to actually define extraordinary and compelling and give the criteria that Congress asked them to lay out. On top of that, in 2016, which was the most recent amendment to Section 1B.1.13, the policy statement and the application note itself were subject to a public hearing and submitted to Congress, which separates it from many of the other guidelines where that wasn't the case. I see. Okay. Why would they do it in an application note then? Like, does it make it easier for them to change it? The statute says they need to do it in a policy statement. You're saying here they went through the equivalent process, so there's no reason to get hung up on labels. I'm just wondering why they would have done it this way. Any answers on that? Unfortunately, I can't speak for the Sentencing Commission as to why they initially chose back, you know, in 2006 and 2007, they started adding more detail to the guideline only through the application note. And unfortunately, I don't know the reasoning behind that. But what I do know is that it still went through the process most recently in 2016, which gives it the force of law that it needs and makes it so that you could look at it as if that was just the next policy statement, 1B.1.14, even though it's in the application note itself. Okay. I'd like to just briefly address Mr. Ahn's argument with relation to the COVID. A follow-up question to that. I mean, I think that's an interesting argument, but I'm thinking back to being a district judge. So when you're trying to figure out whether you're bound by something, every time you're sentencing somebody, you have to figure out if an application note happened to be appended to a policy statement that was submitted to Congress. Just as a practical matter, how would the district judges even know unless they did the legislative search that you did? Well, here I think what is meaningful is that the statute itself says that it has to be consistent with the policy statement. And the policy statement is read in full with 1B.1.13 and the actual application note because that's what puts the meat on the bones. That's what actually carries out the directive from Congress in providing examples and establishing the criteria for extraordinary and compelling. That's an answer, but it didn't answer the question. Practically, the district courts, they are tasked with relying on the guideline itself and the application note. Whether or not they're doing the legal research and the legislative research into the history, this is what has been provided to them and what is applicable guideline and consistent with the statement. I get that, but your whole argument is some application notes have the force of law and some don't. And they don't say on the face of them which are which, right? That's correct. Okay. I'd like to just briefly address with my minute remaining the use of the district court relying on COVID cases at FPC Alderson. Elias claims that this was the only thing that the district court relied on in order to deny compassionate release, which was not the case here at all. The district court relied on the fact that hypertension did not constitute an extraordinary and compelling reason. And in light of COVID did not constitute an extraordinary and compelling reason either. And courts across the country during the pandemic have used facility counts as an important factor in determining the risk of COVID. And at the time of the district court's order, there were very little cases at FPC Alderson. And that is still the case. And I'd like to point out just in comparison that Ms. Elias was actually requesting to be released to Stark County, which in comparison is one of Ohio's top 10 counties with the most COVID cases. With that, I would ask that this court affirm the district court's denial of Ms. Elias's motion for compassionate release. Thank you. Thank you. Mr. Ron. Yes. I'd just like to make a, I think, three brief points in rebuttal. First, I'd like to note for the court that the Sixth Circuit already has a test for determining what the distinction is between an application note and a policy statement and when the application notes can be seen to be binding. And that comes from Havis incorporating the Auer test from Stinson, the Supreme Court case from 1993. As we discussed in our reply, the Auer test is relatively limited in scope and application, and there are several circumstances where the test should not be applied, including when the agency's regulation merely parrots statutory language. That is exactly what happened here in the text of 1B1.13. And thus, that sort of deference should not apply in this case. The government also notes that the BOP was vested with the power to decide other reasons because they were the ones bringing the motion in the first place. I think that from a structural standpoint, it makes more sense to read it as if the BOP were the initial gatekeeper in terms of deciding whether these motions had merit. That's no longer the case at this point. The courts are the gatekeeper for compassionate release motions, even if this court rejects the Second Circuit's test and believes that, excuse me, sorry. Even if this court rejects the Second Circuit's test and believes the policy statement is applicable, it is the district courts who are deciding these as the gatekeeper in the state of the law as it is now. I'd finally just like to note the government stated that because hypertension is so common, they believe that it is not extraordinary and compelling. Neither the word extraordinary nor compelling, by their normal definitions, say anything about the commonness of a particular extraordinary and compelling circumstance. If a circumstance is extraordinary and compelling and affects large portions of the population by the text of the statute, that still constitutes an extraordinary and compelling circumstance. I hate to quibble, but extraordinary means it's out of the norm, right? So if it affects the norm, if it affects like 60% of the population, then surely it wouldn't be extraordinary, right? I think that depends on how you, I understand the court's sort of concern, but for example, COVID-19 is something that is affecting large portions of the country and it is out of the ordinary. And I think that this is a case where something can be extraordinary and common. And so the fact that, I don't think that the government's position that an extraordinary and compelling circumstance can never be common is the proper test to use in this case. Mr. Ahn, your time's up. Do you have a one sentence wrap up or is that it? I will rest on my arguments. Thank you very much. Thank you both very much for your thoughtful arguments and your briefs in this case. We appreciate you answering the questions and the case will be submitted.